UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:07-CV-17 - FL(3)

| TAMMY M. THORTON, | ) | |
|---|---|---|
| Plaintiff | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

This matter is before the Court upon the parties' cross-motions for Judgment on the Pleadings **[DE's 14 & 16]**. The time for the parties to file any responses or replies has expired. Accordingly, these motions are now ripe for adjudication. Pursuant to 42 U.S. C. § 405(g) and § 1383(c)(3), the underlying action seeks judicial review of the final decision by Defendant denying Plaintiff's application for Disability Insurance Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(b)(1), this matter is before the undersigned for a memorandum and recommendation. For the reasons set forth herein, the undersigned recommends that Plaintiff's Motion for Judgment on the Pleadings **[DE-14]** be DENIED and Defendant's Cross-Motion for Judgment on the Pleadings **[DE-16]** be GRANTED.

## **Statement of the Case**

Plaintiff applied for DIB on December 2, 2002, alleging that she became unable to work on September 10, 2002 (Tr. 19-20).[1] This application was denied at the initial and reconsideration levels of review. *Id.* At 36-37. A hearing was held on May 12, 2005 before an Administrative Law

---

[1] Plaintiff's original alleged onset date was January 1, 2001. (TR. 104). Plaintiff subsequently amended the onset date to September 10, 2002.

Judge ("ALJ") who found Plaintiff was not disabled during the relevant time period in a decision dated August 22, 2005. *Id.* at 370-414, 19-27. On November 17, 2006, the Social Security Administration's Office of Hearings and Appeals denied Plaintiff's request for review, thus rendering the ALJ's decision the final decision of the Defendant. *Id.* at 6-9. Plaintiff filed the instant action on January 22, 2007 **[DE-3]**.

## Standard of Review

The Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, it is this Court's duty to determine both whether the Commissioner's finding that Plaintiff was not disabled is "supported by substantial evidence and

2

whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## Analysis

The Social Security Administration has promulgated the following regulations which establish a five-step sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f). Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. (Tr. 20). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) insulin-dependent diabetes mellitus, 2) headaches, 3) fibromyalgia, and 5) depression. *Id.* at 22. The ALJ did not address whether or not Plaintiff's obesity was a severe impairments. In completing step three, however, the ALJ determined that these impairments were not severe enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. *Id.*

The ALJ then proceeded with step four of his analysis and determined that Plaintiff retained the residual functional capacity ("RFC") to perform a wide range of sedentary work. *Id.* at 23.

Based on this finding, the ALJ found that Plaintiff could not perform any of his past relevant work. *Id.* at 24. However, the Vocational Expert testified that based on Plaintiff's age, education, past relevant work experience, and RFC, she was capable of making a vocational adjustment to other work. *Id.* at 25. Finally, at step five, the ALJ concluded that the Medical-Vocational Guidelines ("Grids") Rule 201.29 directed a finding that Plaintiff was not disabled at any time through the date of his decision. *Id.* at 25-26. In making these determinations, the ALJ cited substantial evidence, a summary of which now follows.

Dr. Randy S. Crumpler diagnosed Plaintiff with diabetes mellitus in 1997 and treated her for migraine headaches in 1998. *Id.* at 21. Subsequently, Plaintiff sustained back injuries from a motor vehicle accident on February 12, 1999. *Id.* at 21, 113. Initially, she was treated at the Wake Medical Center Emergency Room for her injuries, however, she followed up her treatment with Dr. Michael D. Gwinn, for cervical, thoracic, and lumbar strain injuries with degenerative changes and disc protrusions at L4-5 and L5-S1. *Id.* at 21, 113. As a result of the accident, Plaintiff also had myofascial pain of the cervical region with associated tension headaches and dizziness, but an MRI of the brain was normal and she underwent physical therapy and used a TENS unit. *Id.* at 21. Following several visits regarding her injuries, on May 17, 2000, Dr. Gwinn advised plaintiff to continue a regular home exercise program. *Id.* at 21, 139. The doctor also reported that Plaintiff had reached maximum medical improvement. *Id.* at 21, 140.

On July 21, 2000, Dr. David A. Konac treated Plaintiff for complaints of vertigo. *Id.* at 21. Upon examination, Plaintiff was found to have lightheadedness without true vertigo, polycystic ovarian disease, diabetes mellitus with poor glucose control, and myofascial pain syndrome. *Id.* at

21, 201. Subsequently, on May 18, 2001, Dr. Crumpler diagnosed Plaintiff with myalgia and joint pain, shoulder pain secondary to injury, and chronic dizziness. *Id.* at 21, 229. A month later, on June 7, 2001, Plaintiff was treated by Dr. Tejpal S. Dhillon, and was diagnosed with acute traumatic bursitis of the left shoulder and acute trochanteric bursitis of the left hip and was given Vioxx and Xanax for her treatment. *Id.* at 21, 197.

On July 18, 2001, Plaintiff sought further medical treatment for her symptoms with Dr. Ann Dooley. During her examination, Plaintiff reported that she had daily muscle pain and stiffness, particularly in her neck, shoulders, and hip. *Id.* at 21, 309. In addition, she complained of memory loss, difficulty sleeping, irritability and feeling tired everyday. *Id.* at 21, 310. She also explained that she had problems with depression in the past but did not feel that her current symptoms were related to ongoing depression. *Id.* Furthermore, she told Dr. Dooley that her blood sugars were reasonably well controlled, but that she had gone on insulin for better diabetes control because she was trying to become pregnant. *Id.* Dr. Dooley diagnosed Plaintiff with diabetes, possible polycystic ovarian syndrome, a history of multiple miscarriages, gastrointestinal reflux disease, and migraines. *Id.* at 21, 312. The doctor also concluded that Plaintiff's complaints and the physical examination were consistent with a diagnosis of fibromyalgia as she had muscular pain with notable trigger points. *Id.* For treatment of these symptoms, Dr. Dooley recommended that Plaintiff exercise three to four times per week for at least 30 minutes. *Id.*

Several months later, Plaintiff returned to Dr. Dooley for a follow-up visit. *Id.* at 21, 307. During this visit, Plaintiff reported that she had completed physical therapy and noted some improvement; however, she continued to have diffuse pain. *Id.* She also reported that she had been

using Benadryl for insomnia. *Id.* Dr. Dooley conducted a musculosketal examination; the examination revealed no active synovitis, and that Plaintiff had a good range throughout. *Id.* at 21, 308. In addition, Plaintiff continued to show 18 out of 18 points tender for fibromyalgia, but less pain on palpation and decreased trapezius muscle spasm than her initial visit. *Id.* In her assessment, Dr. Dooley stated that she had discussed with Plaintiff the necessity to continue aerobic exercise to control her musculoskeletal pain. *Id.* The doctor also mentioned that she would not schedule any further visits for the Plaintiff, but would refer her back to her primary care physician. *Id.* Additionally, in a letter dated December 11, 2001, Dr. Dooley reiterated that Plaintiff's rheumatic diagnosis was fibromyalgia. *Id.* at 21, 306. She also indicated that she had not assigned a disability rating for Plaintiff and had recommended aerobic exercise and physical therapy for the treatment of Plaintiff's fibromyalgia. *Id.* Dr. Dooley had also advised Plaintiff to increase her aerobic activity and not to limit or curtail any of her activities of daily living. *Id.*

Following Dr. Dooley's assessment, Plaintiff returned to her primary care physician, Dr. Crumpler, for her treatment of fibromyalgia, diabetes and depression. On March 5, 2002, a laboratory report noted that Plaintiff's diabetes was in good control and her AIC was 5.8. *Id.* at 22, 220-221. In that same month, on March 21, 2002, Plaintiff indicated that the Effexor was working better than the other medications for her fibromyalgia and depression. *Id.* at 22, 217-219. The final progress note in the file from Dr. Crumpler is dated August 1, 2002. *Id.* at 22, 215. During this visit, Plaintiff was seen for a rash on her face. *Id.* She also reported that she was four months pregnant and had discontinued some of her medications due to the pregnancy. *Id.* By discontinuing her medications, some of her symptoms started flaring up and she began to experience increased

6

pain and a lack of energy; she was also having difficulty sleeping. *Id.* For treatment, Dr. Crumpler encouraged aerobic exercise and suggested that Plaintiff contact her obstetrician for a recommendation for sleep aids. *Id.*

Additional medical records in the file indicate treatment that was subsequent to the expiration of Plaintiff's insured status and were not considered in deciding the issue of disability. *Id.* at 22, 316-332, 338-364. These records are from the North Carolina Arthritis and Allergy Care Center beginning in December of 2004 and from examinations by Dr. Laura K. Jozewicz beginning in January 2005. *Id.* These records reflect other diagnoses than those previously discussed, which include osteoarthritis, palm flexor tenosynovitis, bilateral carpel tunnel syndrome, progressive cognitive decline, and neuropathy. *Id.* at 22, 322, 344, 354, 362.

Dr. Crumpler completed an evaluation of Plaintiff's RFC on May 13, 2005. *Id.* at 22, 333-337. In the RFC questionnaire, Dr. Crumpler indicated that he had been treating Plaintiff for migraines, gastrointestinal reflux disease, and polycystic syndrome since the 1980s. *Id.* He also reported that Plaintiff had been diagnosed with fibromyalgia by a rheumatologist but he deferred to the rheumatologist for the clinical findings and laboratory tests results for Plaintiff's diagnoses. *Id.* Despite his deference, Dr. Crumpler still reported that Plaintiff could only lift 10 pounds occasionally, walk a half a city block, stand 20 minutes, and sit 20 to 30 minutes, but needed to be able to shift positions at will. *Id.* at 22, 335. In addition, the doctor also noted that the Plaintiff was incapable of even "low stress" jobs and indicated that Plaintiff's symptoms and limitations had applied since 1999. *Id.* at 22, 334, 336.

Another evaluation of Plaintiff's RFC was completed by DDS medical consultant Dr.

7

William Farley on February 4, 2003. *Id.* at 23, 279-286. Dr. Farley determined that Plaintiff was capable of : 1) occasionally lifting and/or carrying 50 pounds; 2) frequently lifting and/or carrying 25 pounds; 3) standing and/or walking (with normal breaks) about six hours in an eight hour workday; 4) sitting (with normal breaks) for a total of six hours in an eight hour workday; and 5) pushing and/or pulling with no limitations other than as shown for lifting and/or carrying. *Id.* at 23, 280. Plaintiff was also deemed able to climb, balance, kneel, crouch and crawl without any postural limitations. *Id.* at 281. No manipulative, visual, communicative, or environmental limitations were noted. *Id.* at 282-283.

In addition, DDS medical consultant, Dr. Margaret D. Barham, completed an evaluation of medical severity on February 6, 2003. *Id.* at 24, 287. In the evaluation, the consultant concluded that Plaintiff's depression resulted in mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. *Id.* at 24, 299. Furthermore, the consultant also opined that there was insufficient evidence to establish repeated episodes of decompensation. *Id.*

During the hearing in this matter, Plaintiff testified that she has two daughters, ages 2 and 13. *Id.* at 23. She reported that she home-schooled her children and described other activities of daily living as working a little selling cosmetics, driving daily, and taking her children to lessons. The claimant also stated that she goes online and reads support group material. *Id.* Susan Mimidis also testified and corroborated the claimant's testimony. *Id.*

With regard to Plaintiff's testimony, the ALJ made the following findings:

> After careful consideration of testimony at the hearing and all of the evidence in the file, the undersigned finds that the claimant alleges greater limitations than can be

8

> reasonably be supported by the objective findings concerning her condition prior to December 31, 2002 when her insured status expired. Written evidence concerning the claimant's activities of daily living reveal that despite her allegations of limitations, she continues to engage in a variety of daily activities. The Administrative Law Judge believes that those activities are consistent with an ability to do a wide range of sedentary work, and therefore, she was not so limited that she was precluded from performing some work prior to December 31, 2002, the date her insured status expired.
>
> *Id.* at 23.

After weighing this evidence, the ALJ determined that Plaintiff retained the RFC to perform a wide range of sedentary work. *Id.* at 23. Specifically, the ALJ found that:

> [t]he claimant retains the following residual functional capacity: lift and carry up to 10 pounds, sit six hours in an eight-hour workday with occasional standing and walking, and perform simple, routine, repetitive tasks, in a low-stress, non-production environment.
> *Id.*

Finally, a Vocational Expert ("VE") testified at the administrative hearing. *Id.* at 25, 408-412. Based on the ALJ's RFC determination, the VE opined that Plaintiff was not capable of performing her past relevant work, but had some skills that transferred to sedentary, semi-skilled jobs. *Id.* at 25, 409. Specifically, the VE testified that a person of Plaintiff's RFC, age, education and work experience could perform the occupations of surveillance system monitor, order clerk, food and beverage, and charge account clerk. *Id.* at 25, 410. Each of these jobs exist in significant numbers in the national economy. *Id.* Accordingly, the ALJ determined that Plaintiff had not been under a disability through the date of her decision. *Id.* at 26.

Based on the foregoing record, the Court hereby finds that there was substantial evidence to support the ALJ's conclusions. The undersigned shall now address Plaintiff's specific assignments of error.

9

## Assignments of Error

**A.  The ALJ's Determination That Plaintiff Has Transferable Skills To Jobs Within Her Residual Functional Capacity Had No Effect On The Outcome Of This Matter.**

Plaintiff asserts that the ALJ erred by concluding that Plaintiff has transferable skills from skilled and semi-skilled work she has previously performed. (Plaintiff's brief, pp. 6-7). However, although the ALJ indeed found that Plaintiff has transferable math and clerical skills (Tr. 25, 27) all three of the jobs cited by the Vocational Expert ("VE") at step five of the sequential analysis are classified as unskilled jobs by the Dictionary of Occupational Titles (DOT).

The VE testified that Plaintiff could perform the sedentary jobs of surveillance system monitor; order clerk, food and beverage; and charge account clerk. (Tr. 410). The VE further provided the specific DOT listing for each occupation (surveillance system monitor, 379.367-010; order clerk, food and beverage, 209.567-014; and charge account clerk, 205.267-014). *Id.* Each of these DOT listings indicates a Specific Vocational Preparation ("SVP") of 2, which equates to "[a]nything beyond [a] short demonstration up to and including 1 month." *See* DOT, Appendix C. In addition, based on the skill level definitions provided in 20 C.F.R. §§ 404.1568, and 416.968, job listings for SVP 2 correspond with unskilled work. *See* 2000 SSR LEXIS 8.

As defined in Appendix C of the DOT, Specific Vocational Preparation is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.* As noted above, an SVP of 2 requires less than 30 days to learn.

Furthermore, SSA's regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time...a person can

10

usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." *See* 20 C.F.R. § 404.1568(a).

In sum, the ALJ did conclude that Plaintiff has transferable skills from previously performed skilled and semi-skilled work. However, because the VE cited several unskilled jobs that accommodate Plaintiff's limitations, the ALJ's findings regarding Plaintiff's skills had no effect on the outcome of this case. Accordingly, Plaintiff's argument is without merit.

**B.     The ALJ Is Not Required To Make An Inquiry To the Vocational Expert As To Whether The Expert's Testimony Conflicts With The Dictionary of Occupational Titles.**

Plaintiff next alleges that Social Security Ruling (SSR) 00-4p requires the ALJ to elicit testimony from the VE to determine whether the jobs cited by the VE conflict with the DOT. (2000 SSR LEXIS 8) (Plaintiff's brief, pp. 7-8). This argument is incorrect because the ALJ was not required to make such an inquiry. With regard to both sources, they "should typically be consistent, [however] Ruling 00-4p nonetheless provides that 'When there is an <u>apparent</u> conflict between [vocational expert] evidence and the [Dictionary of Occupational Titles], the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." <u>Fisher v. Barnhart</u>, No. 05-1473 (4th Cir. March 17, 2006)(unpublished opinion)(emphasis added). The VE's testimony is consistent with the Plaintiff's limitations that were discussed by the ALJ and they are also consistent with the listings provided in the DOT. Additionally, in her brief, Plaintiff does not allege that there were any apparent conflicts between the VE's testimony and the DOT. Thus, without more, Plaintiff's argument is meritless.

11

**C.    Plaintiff's Subjective Complaints Were Properly Considered.**

Plaintiff assigns error to the ALJ's determination regarding the credibility of Plaintiff's testimony. Specifically, Plaintiff alleges that "[i]n his decision, the ALJ fail[ed] to outline with particularity the reasons, and more importantly, the <u>evidence</u> used to make the determination that the claimant's testimony regarding pain was not credible." (Plaintiff's brief p. 9). While Plaintiff couches her argument in terms of pain, she is really challenging the ALJ's conclusion regarding the extent of her limitations. The ALJ found that "the claimant's statements about her impairments and their impact on her ability to work [were] not entirely credible in light of the objective medical evidence." (Tr. 23). As discussed above, in reaching this conclusion, the ALJ noted the following:

> At the hearing, the claimant testified that she has two daughters, ages 2 and 13. She reported that she home-schooled her children and described other activities of daily living as working a little selling cosmetics, driving daily, and taking her children to lessons. The claimant also stated that she goes online and reads support group material. Susan Mimidis also testified and corroborated the claimant's testimony. Objective medical evidence reveals that the claimant was involved in a motor vehicle accident in February 1999 and underwent treatment for cervical, thoracic, and lumbar strains. She was diagnosed with fibromyalgia in July 2001 and aerobic exercises and physical therapy were recommended and she was advised not to limit or curtail any of her activities of daily living. The claimant also has a diagnosis of diabetes mellitus, however records show that it is in good control on medication. After careful consideration of testimony at the hearing and all of the evidence in the file, the undersigned finds that the claimant alleges greater limitations than can be reasonably be supported by the objective findings concerning her condition prior to December 31, 2002 when her insured status expired. Written evidence concerning the claimant's activities of daily living reveal that despite her allegations of limitations, she continues to engage in a variety of daily activities. The Administrative Law Judge believes that those activities are consistent with an ability to do a wide range of sedentary work, and therefore, she was not so limited that she was precluded from performing some work prior to December 31, 2002, the date her insured status expired.
> *Id.* at 23.

The Court notes that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to

12

be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). Therefore, the Court finds that substantial evidence exists to support the ALJ's determination that Plaintiff's allegations regarding her limitations are not entirely credible.

**D.     The ALJ Properly Rejected the Medical Opinion of Plaintiff's Treating Physician**.

Plaintiff contends that the ALJ erred when he chose not to give controlling weight to the medical opinion of Dr. Crumpler. "Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam). "Rather, according to the regulations promulgated by the Commissioner, a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 166 F.3d 1209 (4th Cir.1999) (internal citations omitted).

In the order, the ALJ explained his reasons for giving Dr. Crumpler's opinion less than controlling weight and these reasons were supported by substantial evidence. Specifically, the ALJ discounted his opinion because it was not "supported by his own treatment records or other medical

13

evidence as a whole." (Tr. 24). As noted above, Dr. Crumpler submitted an RFC on May 13, 2005, nearly 2 ½ years after Plaintiff's disability insured status had expired. *Id.* In the questionnaire, he indicated that he would defer to Plaintiff's rheumatologist for the clinical findings and laboratory test results concerning Plaintiff's fibromyalgia. *Id.* However, he noted that Plaintiff suffered from several limitations as a result her condition since 1999. *Id.* at 24, 336. Some of these limitations included the fact that Plaintiff would be incapable of even "low stress" jobs, and that her pain or symptoms were severe enough to interfere with her attention and concentration to perform simple work tasks. *Id.* at 334. Furthermore, Dr. Crumpler also asserted that Plaintiff could only walk half a city block before resting, sit for 20-30 minutes at a time, stand for 20 minutes before needing to sit down, and occasionally lift less than 10 pounds. *Id.* At 334-335.

The ALJ concluded that Dr. Crumpler's opinions were inconsistent with his own records and substantial medical evidence because when Plaintiff was initially diagnosed with fibromyalgia in July 2001 and throughout her treatment by Dr. Dooley, she was advised and encouraged to exercise three to four times a week for 30 minutes and not to limit or curtail any of her daily activities. *Id.* at 24. In addition, in his final progress note in the record, dated August 1, 2002, Dr. Crumpler himself encouraged Plaintiff to engage in aerobic activity as treatment for her fibromyalgia symptoms. *Id.* at 215. Thus, because Dr. Crumpler's opinions could not be supported by his own records or objective medical evidence as a whole, the ALJ gave his opinions little weight. *Id.* This decision was supported by substantial evidence and the Plaintiff's claim is meritless.

**E.      The ALJ Did Not Err When Determining Plaintiff's Residual Functional Capacity.**

Plaintiff assigns error to the ALJ's determination that the Plaintiff can perform simple,

14

routine, repetitive tasks, in a <u>low-stress</u>, non-production environment since stress is "highly individualized." (Plaintiff's brief, p. 12)(emphasis added). Basically, Plaintiff alleges "an ALJ cannot characterize a job as being 'low-stress' because the claimant may feel the job is high-stress based on her individualized mental disposition." (Plaintiff's brief, p. 12). In support of her claims, Plaintiff relies on SSR 82-62 and 85-15.

Plaintiff misinterprets both Social Security Rulings; neither supports her position. Both SSR 82-62 and SSR 85-15 deal with the issue of stress and mental impairments. Specifically, SSR 85-15 states:

> it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings...The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by the adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day...Thus the mentally impaired may have difficulty meeting the requirements of even so-called 'low-stress' jobs.
> (1985 SSR LEXIS 20).

When making his ruling, the ALJ did recognize Plaintiff's history of depression and concluded that her depression was a severe impairment. (Tr. 22, 26). However, nothing in his ruling or the record indicates that her depression was a "mental impairment" or that it would prevent her from accommodating to the demands of work or daily activities.

For instance, on January 15, 2002, Drs. Poorvi Sha and Mary Ann Dooley concluded that Plaintiff's "depression in the past has been related to adjustment problems with the loss of both her adopted parents." *Id.* at 310. Furthermore, Plaintiff herself testified that she participates in a wide variety of daily activities that do not comport with SSR 85-15's explanation of a mental impairment.

15

Notably, she drove her car daily, (Tr. 375), attended church once or twice a month (Tr. 86), participated in an online fibromyalgia support group (Tr. 86), went to the movies once a month (Tr. 86), dined out (Tr. 86), played board games with her family (Tr. 86) and read (Tr. 86).

Finally, SSR 85-15 emphasizes:

> Determining whether [mentally impaired] individuals will be able to adapt to the demands of work or "stress" of the workplace is often extremely difficult. This section is <u>not intended to set out any presumptive limitations</u> for disorders, but to emphasize the importance of thoroughness in evaluation of an individualized basis (1985 SSR LEXIS 20)(emphasis added).

The ALJ properly considered all of Plaintiff's limitations when determining her RFC by restricting her to simple, routine, and repetitive tasks in a low-stress non-production environment (TR. 24, 26, 410). Based on the limitations presented by the ALJ, the VE testified that their were three jobs that the Plaintiff was capable of performing. *Id.* According to the descriptions provided by the DOT, none of the jobs listed by the VE involve any technical, managerial, or skilled work. Therefore, because substantial evidence supports the ALJ's determination regarding her RFC, the Plaintiff's argument is without merit.

**E.  The ALJ Did Not Err In Failing to Determine Whether Plaintiff's Obesity Was a Severe Impairment.**

Plaintiff alleges that the ALJ erred by failing to make a determination as to whether Plaintiff's obesity is a severe impairment. Specifically, Plaintiff asserts "[t]he administrative law judge despite having solicited this information directly from the claimant himself does not list obesity as a severe impairment in his findings." (Plaintiff's brief p. 13). At step two of the five-step sequential analysis, the ALJ must consider the severity of an impairment both individually and in combination with other impairments. Cook v. Heckler, 783 F.2d 1168, 1174 (4th Cir. 1986). An

16

impairment is "severe" unless it "has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984)(internal quotations omitted). Thus, the severity standard is a slight one. Stemple v. Astrue, 475 F. Supp. 2d 527, 536 (D. Md. 2007).

Here, the ALJ failed to analyze obesity when discussing Plaintiff's impairments and resulting RFC in step two of the sequential analysis. However, Plaintiff did not allege obesity as an impairment when she filed her application for benefits. *Id.* at 69. In addition, while testifying, she stated that she believed her migraines and fibromyalgia prevented her from working, not obesity. *Id.* at 376. Furthermore, there is only a single reference to Plaintiff's obesity in her medical records. *Id.* at 197. For these reasons, the undersigned finds Plaintiff's argument meritless.

**F.     The ALJ Did Not Err In Failing To Consider Medical Evidence Submitted After The Expiration Of Plaintiff's Insured Status**.

In Plaintiff's final assignment of error, she makes several arguments regarding the ALJ's failure to consider medical evidence. First, she asserts that the ALJ should have considered additional medical records from another consulting physician who began treating her in 2004. To support her argument, she contends "[f]ibromyalgia is not a disease of acute onset" and "SSR 83-20 outlines that a slowly progressive impairment may allow the ALJ to infer an onset date." (Plaintiff's brief p. 13). Plaintiff's reliance on SSR 83-20 is misplaced. Specifically, the purpose of the ruling is to determine the onset date of a claimant's disability, but only in cases where the claimant is in fact disabled. (1983 SSR LEXIS 25). In the present case, the ALJ concluded that Plaintiff failed to establish that she had a disability at any time. (Tr. 26). Therefore, SSR 83-20 is inapplicable to

17

Plaintiff's case.

Plaintiff next alleges that by failing to consider additional medical evidence after the expiration of her insured status, "the ALJ may have overlooked valuable evidence which could have been critical to the evaluation of the claimant's disability." (Plaintiff's brief p. 14). Notably, the Plaintiff does not mention or explain which additional evidence might be relevant to her claim. Thus, her argument amounts to nothing more than speculation.

In addition, in his ruling, although the ALJ did state "[o]ther medical records in the file are after the expiration of the claimant's insured status and were not considered in deciding the issue of disability," he also explained his reasoning for not considering this evidence. (Tr. 22). He noted that the records from the North Carolina Arthritis and Allergy Care Center beginning January 2004 (Tr. 316-332) and from Dr. Laura Jozewicz beginning in January 2005 (Tr. 338-364) "show other diagnoses than those previously discussed and include osteoarthritis, palm flexor tenosynovitis, and progressive cognitive decline, bilateral carpel tunnel syndrome, and neuropathy." *Id.* at 22. Furthermore, the only other medical evidence submitted after the expiration of Plaintiff's insured status was Dr. Crumpler's RFC questionnaire (Tr. 333-337), and this was fully analyzed by the ALJ in his ruling. *Id.* at 22, 24.

Accordingly, because the ALJ's determination that Plaintiff was not disabled during the relevant time period is supported by substantial evidence, Plaintiff's arguments are without merit.

## Conclusion

For the reasons discussed above, it is HEREBY RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-14]** be DENIED, Defendant's Motion for Judgment on the

Pleadings **[DE-16]** be GRANTED, and the final decision by Defendant be AFFIRMED.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this 23rd day of August, 2007.

_____
William A. Webb
U.S. Magistrate Judge